# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00369-COA

**JEROME MACK AUSTIN JR. A/K/A JEROME MACK AUSTIN A/K/A JEROME M. AUSTIN JR.**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

DATE OF JUDGMENT:               02/07/2018
TRIAL JUDGE:                    HON. KATHY KING JACKSON
COURT FROM WHICH APPEALED:      JACKSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         OFFICE OF STATE PUBLIC DEFENDER
                                BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: ALICIA MARIE AINSWORTH
DISTRICT ATTORNEY:              ANTHONY LAWRENCE III
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 06/25/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., GREENLEE AND C. WILSON, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.    A Jackson County jury found Jerome Mack Austin Jr. guilty of two counts of sexual battery against his daughter, Amy,[1] who was twelve years old when the acts occurred. Austin was sentenced to thirty years on each count to be served consecutively. After denial of his post-trial motions, Austin appealed and asserted that the trial court erred in admitting Amy's out-of-court statements under the tender-years exception to the hearsay rule, and that the trial court erred in denying Austin's motion for a judgment notwithstanding the verdict (JNOV)

---

[1] An alias is used to protect the victim's identity.

because there was insufficient evidence to support a sexual battery conviction under Count I of the indictment, which charged Austin with committing sexual battery by "inserting his penis into [the victim's] vagina." Finding only harmless error with respect to the trial court's tender-years hearsay ruling and finding no error in the trial court's denial of Austin's JNOV motion we affirm.

## STATEMENT OF FACTS AND COURSE OF PROCEEDINGS

¶2. Austin was indicted on two counts of sexual battery under Mississippi Code Annotated section 97-3-95(1)(d) (Rev. 2014) on April 16, 2013. In relevant part, Count I charged that between November 1, 2010 and May 31, 2011, Austin committed sexual battery on Amy, "who was at the time in question under fourteen . . . years of age, by engaging in the act of sexual penetration, to-wit: inserting his penis into her vagina . . . ." Count II charged that Austin committed sexual battery on Amy "by engaging in the act of sexual penetration, to-wit: inserting his fingers into her vagina. . . ." After a two-day trial, Austin was convicted by a unanimous jury on both counts and was sentenced to a total of sixty years in the custody of the Mississippi Department of Corrections (MDOC).

¶3. Prior to trial, a tender-years hearing was conducted on the State's motion in limine seeking a determination whether out-of-court statements made by Amy to her mother, Tuesday Austin, and to social worker Erin Malak in the course of a forensic interview, were admissible hearsay statements pursuant to Rule 803(25) of the Mississippi Rules of Evidence. The trial court granted the State's motion by order entered February 5, 2018. To avoid repetition, the details of the tender-years hearing and the trial court's order will be discussed

2

below in connection with Austin's first assignment of error concerning the court's ruling on this issue.

¶4.     Trial began on February 6, 2018.  Amy's mother, Tuesday, was the State's first witness.  She testified that she and the defendant were married in 1998, and separated after two years.  Amy was born in October 1998.  Tuesday testified that she moved to LaCrosse, Wisconsin in 2003, and Amy lived with her for a time, and then from the time Amy was six years old, she lived with her grandmother, Darlene (Austin's mother) in Gautier, Mississippi. Tuesday continued to live in Wisconsin with Amy's two younger sisters.  At some point, a custody battle developed and ultimately Darlene was granted full custody of Amy.  Amy would visit Tuesday on holidays and during the summer.

¶5.     Tuesday testified that in June 2011, when Amy was visiting her in Wisconsin, Tuesday read in Amy's diary that she was being molested.  Tuesday asked Amy if she was molested and Amy told Tuesday that Austin had been molesting her since she was eight years old.  Amy was examined at the hospital that same day and testing revealed that she had contracted chlamydia.  Tuesday contacted social services and the police.

¶6.     Amy was the State's next witness.  She testified that her father started sleeping in another bed in her room when he would stay at her grandmother Darlene's home. She testified that one night, when she was twelve, she woke up because Austin was putting "pressure" on her vagina with his penis.  She said it hurt.  She testified, "I knew it wasn't in me but it was just pressing against me, jumbled up."  When asked what her father was doing with his penis, Amy said he was "more like trying to penetrate but it's just pushing against

3

it. It's not really getting anywhere." She testified that his penis was uncovered and his skin was touching her skin. She wore pull-ups at the time for bed-wetting issues, and she testified that her pull-ups were off but that her nightgown was still on. Amy told Austin that she had to use the bathroom, and he told her, "Pee on me." Amy testified that she said no and then got up to go to the bathroom. In the bathroom, she testified that she realized her vagina "was kind of swollen and it kind of hurt to pee." She slept in the hallway that night.

¶7. Amy also testified that there were times where she would wake up to Austin "fingering" her. She testified he used a blue glove with Olay lotion on it. She said it felt like "razors in [her] vagina" because he had long fingernails. Amy testified that when she would wake up, he would stop and get in his bed and that one time he ran out of the room. She eventually started sleeping rolled up in her sheet so that she would wake up if he tugged on the blanket. Amy testified that she made it a habit to become a light sleeper.

¶8. Amy testified that these incidents happened in 2011 right before she left Gautier to visit her mother. She said she never told anyone because "at first [she] wasn't even sure if it was wrong[, and she] didn't even know what was really going on." She also testified that she did not think anyone would believe her if she told on him. Amy testified that she remembers telling someone that she told her friend, Eullysia, about the sexual abuse because she was nervous and she did not want people to keep questioning her about whom she had told.

¶9. When questioned about living with her grandmother, Amy admitted that she was unhappy living with her grandmother in Mississippi and that she wanted to live in Wisconsin

4

with her sisters—but when asked whether she would "have made all this up just so [she] could go live with [her] sisters," Amy responded, "No." Amy also testified that she never wanted to hurt her grandmother Darlene. On redirect, Amy confirmed that Austin was the only person who had had sexual contact with her at the time she tested positive for chlamydia in June 2011, and that it was not possible for anyone else to have given her chlamydia.

¶10. The State's next witness was Erin Malak, a social worker with the La Crosse Health and Human Services in Wisconsin. The trial court accepted her as an expert in the field of forensic interviewing. Malak conducted a forensic interview of Amy on June 20, 2011, and investigated her allegations. The forensic interview was video-recorded and played for the jury at trial.

¶11. Amy's demeanor during the interview was reserved and quiet. She and Malak discussed what it meant to tell the truth, and Amy said she understood what that meant. She stated that she was twelve. Amy said that she wanted to be in Wisconsin with her mother and sisters. She said her family members in Gautier, Mississippi were her grandmother Darlene, grandfather Mack, and her cousin Anthony (who was also twelve) and that her father (the defendant) would also stay there. When discussing her family in Gautier, she said her grandfather was "cool," but she did not agree with her grandmother about everything. She also said that she and her cousin Anthony did not get along.

¶12. When asked about her relationship with her father, Amy said that she did not like him. She cried when asked about why she does not like her father. Amy said that her father stays in her room when he comes to her grandmother's house. She eventually told Malak that she

woke up with her father on top of her without any clothes on, "pressing" his "part," which she then identified as his penis, on her vagina. She said it felt like a lot of pressure and that his penis was touching the outside because it could not get in. She said she told him she had to use the bathroom and that Austin said "pee on me." She also told Malak that Austin used a blue glove and Olay lotion. Amy said Austin put his fingers inside her body and it "felt pointy." Amy said she had never had sexual intercourse with anyone. At the close of the interview, Amy said that everything she had said was the truth. Malak testified that in her expert opinion Amy's disclosure was consistent with a child who had been sexually abused.

¶13. Malak also testified that she contacted Austin during her investigation. She said that when she spoke with him in July 2011, Austin told her that he was familiar with chlamydia because he had been treated for it the prior year. On cross-examination, Austin's attorney presented Malak with an email between her and Detective Becky Thibodeaux and asked her about their concerns about some inconsistencies in the statements. Malak testified that she did not recall what her concerns were about.

¶14. Another State witness, Becky Thibodeaux, was a detective with the Gautier police department in 2011 and investigated the sexual battery allegations against Austin. She testified that she conducted a telephone interview with Austin on August 3, 2011. He admitted that he had chlamydia in early 2010 and had been treated for it. Austin also told her that he was tested for chlamydia again in June of 2011 and tested negative.[2] Thibodeaux also

---

[2] The record reflects that the State's witness, Jason Smith, a criminal investigator with the district attorney's office, nineteenth circuit district, testified that he could not obtain Austin's medical records to confirm this data because the applicable state law provided that this information was not subject to subpoena and was privileged.

6

testified that she inspected Darlene's home on July 7, 2011, and in the kitchen she found a box of blue surgical gloves that Amy had talked about in her forensic interview. Thibodeaux testified that she also found the Olay lotion in the bathroom, which Amy had also talked about in her forensic interview.

¶15.    The State's witness, Dr. Nestor Delgado, an obstetrician/gynecologist (OB/GYN) in Mississippi, was accepted as an expert in those fields. He testified that he had reviewed Amy's medical records and confirmed that Amy had chlamydia based upon her June 12, 2011 test results. Dr. Delgado testified that "[t]he only way that you can get chlamydia is through some type of sexual contact, be it intercourse, penetration . . . there's got to be some exchange of bodily fluids." Dr. Delgado explained that "[i]t doesn't have to be full penetration [of the penis], just exposure to that vaginal tissue." He also testified that Amy's pain during urination could be explained because sexual intercourse can cause trauma to the urethra because of its proximity. Dr. Delgado testified that Amy's vaginal swelling could be caused by trauma of the labia minora from a lack of lubrication during attempts to penetrate. Dr. Delgado also testified that transmission of chlamydia is "very, very unlikely" through finger penetration; there must be a sexual act.

¶16.    After the State rested, defense counsel moved for a directed verdict on Count I on the grounds that the State had not proven penetration by Austin's penis into Amy's vagina. The trial court denied the motion, finding that "it was all a jury question." Austin did not testify at trial and the defense did not put on any other witnesses. The jury unanimously found Austin guilty on both counts of sexual battery, and Austin was sentenced to thirty years for

7

each count to be served consecutively. Austin moved for a JNOV or alternatively a new trial on February 7, 2018, which the court denied on March 2, 2018. Austin appealed.

## DISCUSSION

### I. The Tender-Years Exception to the Hearsay Rule

¶17. As his first assignment of error, Austin asserts that the trial court erred in admitting Amy's out-of-court statements under the tender-years exception to the hearsay rule. "The standard of review for the admission of hearsay evidence is abuse of discretion." *Friday v. State*, 217 So. 3d 759, 764 (¶18) (Miss. Ct. App. 2017). In examining this issue, we recognize that the record shows that Amy testified at trial and was subject to cross examination where her motive to lie and veracity were questioned. There are therefore no Confrontation Clause issues in this case as delineated in *Crawford v. Washington*, 541 U.S. 36, 68 (2004).[3]

¶18. The tender-years hearsay exception is set forth in Rule 803(25) of the Mississippi Rules of Evidence, as follows:

> **Tender Years Exception**. A statement by a child of tender years describing any act of sexual contact with or by another is admissible if:
>
> > (A) the court—after a hearing outside the jury's presence—determines that the statement's time, content, and circumstances provide substantial indicia of reliability; and
> >
> > (B) the child either:
> >
> > > (i) testifies; or

---

[3] In *Crawford v Washington*, the U.S. Supreme Court set forth guidelines for the admission of a prior testimonial statement of a witness who does not testify at trial. *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

(ii) is unavailable as a witness, and other evidence corroborates the act.

In determining whether an out-of-court statement by the declarant is admissible under this exception, "the court must determine (1) that the declarant is a child of tender years and (2) that the time, content, and circumstances of the statement provide substantial indicia of reliability." *Veasley v. State*, 735 So. 2d 432, 436 (¶14) (Miss. 1999). "[T]here is a rebuttable presumption that a child under the age of twelve is of tender years." *Id.* at 436 (¶16).

¶19.    Where the declarant is twelve years old or older, however, there is no such presumption. *Id.* at 437 (¶16). In this case Amy was twelve years old when she made the statements about Austin's molestation to her mother and Erin Malak. Under these circumstances "the trial court must make a . . . determination as to whether the [declarant] is of tender years. This determination should be made on the record and based on a factual finding as to the victim's mental and emotional age." *Id.* If the trial court finds that the declarant is of tender years, the trial court "must still proceed to determine whether [the victim's] statements had substantial indicia of reliability." *Id.*

¶20.    In this case, the trial court held a tender-years hearing outside the presence of the jury on February 2, 2018. The State presented one witness at the hearing, Amy's mother Tuesday. Tuesday testified that she read Amy's diary where she had written about being sexually abused. Tuesday called her friend's house where Amy was spending the night and told them to meet her at the hospital. Tuesday testified that Amy told her that her dad molested her and that Amy was crying and seemed scared. Tuesday testified that Amy was twelve years old

when she disclosed the abuse. During her testimony, Tuesday explained that Amy had problems wetting the bed and that she wore pull-ups until she was around sixteen. Tuesday also testified about the custody dispute with Darlene over Amy and that every time she spoke with her, Amy told her she wanted to live with her in Wisconsin and not in Mississippi.

¶21. After Tuesday finished testifying, the trial court heard counsel's argument. The trial judge told the parties that she would issue a ruling later that afternoon. No ruling was made on the record at the hearing. On February 5, 2018, the trial court entered its order granting the State's motion. In that order the trial court held:

> T.A.,[4] the victim in this case, was twelve years old at the time the alleged sexual abuse was disclosed to her mother, Tuesday Austin. . . . At the tender years hearing . . . Ms. Austin testified as to the content and circumstances of T.A.'s disclosure. After considering her testimony, and having reviewed the forensic interview, the Court finds the time, content, and circumstances of T.A.'s statements provide a substantial indicia of reliability such that they are admissible hearsay statements pursuant to M.R.E. 803(25).

¶22. The record reflects that Amy was twelve years old at the time she made her statements to her mother and underwent her forensic interview, so the tender-years presumption does not apply. The trial court, therefore, was required to make a finding, on the record, regarding whether Amy was of tender years. The trial court's order contains no "factual finding[s] as to the victim's mental and emotional age," *Veasley*, 735 So. 2d at 437 (¶16), nor were any such findings made on the record at the tender-years hearing. We find that the trial court erred in failing to make a tender-years determination. As we address below, however, we find that this error was harmless.

---

[4] The victim is referred to as Amy in this opinion and the parties' appellate briefs.

¶23. Austin also asserts that the trial court's reliability determination was insufficient because Amy did not testify at the hearing. According to Austin, this prevented the court from hearing the "complete story" surrounding the "the time, content, and circumstances" of Amy's out-of-court statements. We disagree. To determine if there is substantial indicia of reliability, the advisory committee's note to Rule 803(25) urges consideration of twelve factors.[5] M.R.E. 803(25) advisory committee note. "[E]ach factor need not be discussed separately by the trial judge, so long as the record supports a finding that the victim's statements bore indicia of reliability." *Case v. State*, 187 So. 3d 177, 182-83 (¶17) (Miss. Ct. App. 2015) (internal quotation mark omitted).

¶24. In this case, Amy's mother, Tuesday, testified at the hearing regarding Amy's statements, and defense counsel thoroughly cross-examined her on the circumstances that Austin claims indicate that Amy's statements were unreliable. In particular, defense counsel questioned Tuesday about the custody dispute over Amy and about how Amy wanted to live with her in Wisconsin and not in Mississippi. In addition to hearing Tuesday's testimony,

---

[5] The Rule 803(25) advisory committee note provides as follows:

Some factors that the court should examine to determine if there is sufficient indicia of reliability are (1) whether there is an apparent motive on declarant's part to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; (5) the timing of the declarations; (6) the relationship between the declarant and the witness; (7) the possibility of the declarant's faulty recollection is remote; (8) certainty that the statements were made; (9) the credibility of the person testifying about the statements; (10) the age or maturity of the declarant; (11) whether suggestive techniques were used in eliciting the statement; and (12) whether the declarant's age, knowledge, and experience make it unlikely that the declarant fabricated.

11

the trial court also reviewed the video of Amy's forensic interview in making its reliability determination. We find that despite Amy not testifying at the hearing, the trial court had sufficient evidence of the time, content, and circumstances of her out-of-court statements to support its finding of reliability, and we find no abuse of discretion in the court's determination on this issue, particularly because Amy testified at trial and was subject to cross-examination.

¶25. We recognize that even though we find no error in the trial court's reliability determination, this does not cure the court's error in failing to first make an on-the-record finding as to Amy's mental and emotional age. We find, however, that in the context of this case, this was harmless error and does not warrant reversal because Amy testified at trial and there was other evidence supporting a finding of guilt against Austin.

¶26. *Friday v. State* is instructive here. In *Friday*, this Court found error when the trial court failed to make a finding on the record whether the child (who was twelve at the time of the statements at issue) was of tender years. *Friday*, 217 So. 3d at 764-65 (¶20). We found, however, that this error was harmless and did not warrant reversal because "[t]he weight of the evidence of guilt outweighed any harm done by allowing admission of hearsay statements by [the victim's mother and the forensic interviewer]." *Id.* at 765 (¶¶21-22); *see also Nunnery v. State*, 126 So. 3d 105, 109 (¶13) (Miss. Ct. App. 2013) (finding harmless error where trial court failed to conduct a tender-years hearing where the weight of the evidence against the defendant was sufficient to outweigh any harm done by allowing admission of the challenged evidence).

¶27. We find that this test is met here. As to Count I, Amy testified at trial, recounting her abuse and her testing positive for chlamydia. Additionally, other witnesses testified and evidence was submitted supporting a conviction on Count I without Amy's out-of-court statements.[6] We also find that there was sufficient evidence to convict Austin on Count II without Amy's out-of-court statements. Amy testified at trial that she would wake up in her bedroom at her grandmother Darlene's home to Austin "fingering" her; she said Austin had long fingernails and that it felt like "razors in [her] vagina." She also testified at trial that Austin used a blue glove with Olay lotion on it. Thibodeaux testified that she found blue surgical gloves and Olay lotion at Darlene's home.

¶28. We find that the weight of the evidence of guilt against Austin on both counts outweighed any harm done by allowing admission of the hearsay statements by Tuesday and Malak. This is particularly true in this case because the trial court did make an adequate reliability determination with respect to Amy's out-of-court statements, and only failed to make the requisite tender-years determination. Accordingly, we find that the trial court's admission of these statements without a tender-years determination was harmless error.

## II.     Sufficiency of the Evidence Supporting Count I

¶29. Austin asserts that the trial court erred in denying his JNOV motion because there was insufficient evidence to support a sexual battery conviction under Count I of the indictment. For the reasons detailed below, we find that this assertion is without merit. In conjunction

---

[6] In his second assignment of error, Austin challenges the sufficiency of the evidence supporting his conviction on Count I. In order to avoid repetition, we address, in detail, the testimony and evidence supporting his conviction on Count I in the following section.

with our "harmless error" determination relating to Amy's out-of-court statements about her abuse relating to Count I, we do not consider these hearsay statements in our sufficiency-of-the-evidence determination below.

¶30. A JNOV motion challenges the legal sufficiency of the evidence. *Jenkins v. State*, 101 So. 3d 161, 165 (¶12) (Miss. Ct. App. 2012). "When addressing the legal sufficiency of evidence, we consider all evidence in a light most favorable to the State." *Id.* (other quotation mark omitted). In this regard, "[t]he critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed." *McBride v. State*, 61 So. 3d 174, 183 (¶29) (Miss. Ct. App. 2010) (internal quotation mark omitted).

¶31. Austin was indicted for sexual battery under section 97-3-95(1)(d), which provides that "[a] person is guilty of sexual battery if he or she engages in sexual penetration with . . . [a] child under the age of fourteen . . . years of age, if the person is twenty-four . . . or more months older than the child." Count I of Austin's indictment provides that he "did . . . commit [s]exual [b]attery . . . by engaging in the act of sexual penetration, to wit: inserting his penis into [Amy's] vagina[.]" Austin argues that there is no proof that he penetrated Amy's vagina with his penis. We disagree.

¶32. Under Mississippi law, for sexual battery purposes, sexual penetration is "any penetration of the genital or anal openings of another person's body by any part of a person's body, and insertion of any object into the genital or anal openings of another person's body." *Norman v. State*, 725 So. 2d 247, 250 (¶9) (Miss. Ct. App. 1998) (quoting Miss. Code Ann.

14

§ 97-3-97(a) (Rev. 2014)). Particularly relevant here is the principle that "sexual penetration is a term of art, and its legal definition does not require that the defendant's penis be inside the victim in the colloquial sense. Instead, sexual penetration requires only penetration of the labia, the fleshy folds of skin surrounding the entrance to the vagina, and that penetration need only be slight." *Walker v. State*, 262 So. 3d 560, 565 (¶12) (Miss. Ct. App. 2018); *see Johnson v. State*, 626 So. 2d 631, 633 (Miss. 1993) (finding that "slight penetration to the vulva or labia" sufficient to establish penetration on a sexual battery charge); *Moton v. State*, 999 So. 2d 1287, 1293 (¶20) (Miss. Ct. App. 2009) ("Penetration, however slight, is sufficient to establish the penetration element of sexual battery.").

¶33. With these principles in mind, we review Amy's testimony at trial describing what occurred, as follows:

> Q. What made you wake up?
> A. It was pressure on my vagina when I woke up. And I—I saw him. And he— he stopped. And that was what woke me up.
> Q. All right. So you said you felt pressure on your vagina. Did you have clothes on or off?
> A. My pull-up was off. But I believe my nightgown was still on.
> Q. Okay. And what was causing the pressure on your vagina?
> A. His penis.
> Q. And was his penis covered or uncovered or something else?
> A. It was uncovered.
> Q. How did it feel, [Amy]?
> A. It felt more like just, like, pressure on it. I knew it wasn't in me but it was just pressing against me, jumbled up.
> Q. Did it hurt.
> A. Yeah.
> Q. What was he doing with his penis while it was causing pressure on your vagina?
> A. It was just—it's more like trying to penetrate but it's just pushing against it. It's not really getting anywhere. It was just kind of like just putting your fist in your hand, like that.

15

Q. His skin was touching your skin, correct?
A. Yes.
Q. Did he say anything to you?
A. He didn't say anything until I told him I had to use the bathroom.
Q. Okay. What did he say when you told him you had to go to the bathroom?
A. He said, Pee on me.
Q. Did you say anything to him?
A. I told him no, I want to use—I mean, I need to use the bathroom.
Q. So how did it end?
A. He went back and I got up and went to the bathroom.

Amy further testified at trial that when she went to the bathroom she "realized that I was kind of swollen and it kind of hurt to pee."

¶34. The record reflects that the jury was specifically instructed that "in order to sustain a conviction for the crime of Sexual Battery, some penetration must be proven beyond a reasonable doubt. However, it need not be full penetration. Even the slightest penetration is sufficient to prove the crime of Sexual Battery." The jury was also instructed that "the unsupported word of the victim in a Sexual Battery case is sufficient to support a guilty verdict if you find beyond a reasonable doubt that the testimony is believable and it is not discredited or contradicted by other credible evidence."[7]

¶35. "The jury is presumed to follow the instructions given by the trial court." *Evans v. State*, 226 So. 3d 1, 32 (¶83) (Miss. 2017). In this case, Austin did not testify on his own behalf, and the defense put on no other witnesses. Amy's testimony that Austin was pushing his penis against her vagina and putting enough pressure on it that it caused her vagina to

---

[7] *See, e.g.*, *Lindsey v. State*, 212 So. 3d 44, 47 (¶14) (Miss. 2017) ("Our case law clearly holds that the unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other credible evidence."); *Bozeman v. State*, 208 So. 3d 1091, 1093 (¶6) (Miss. Ct. App. 2017).

swell and caused pain when she urinated was sufficient for the jury to infer that Austin at least slightly penetrated Amy's vulva or labia. This is particularly true in this case where there was also other evidence supporting a finding of penetration presented at trial. *Walker*, 262 So. 3d at 565 (¶12); *see Moton*, 999 So. 2d at 1293-94 (¶21).

¶36. In addition to Amy's testimony, the record reflects that Amy tested positive for chlamydia in June 2011. The social worker, Erin Malak, and the investigator, Becky Thibodeaux, testified that Austin admitted to them that he had chlamydia in 2010. According to Dr. Delgado, accepted as an expert in the fields of obstetrics and gynecology, chlamydia is only transmitted through some type of sexual contact where there is an exchange of bodily fluids, such as intercourse or penetration. He explained that "[i]t doesn't have to be full penetration [of the penis], just exposure to that vaginal tissue." Dr. Delgado also testified that Amy's burning during urination could be explained because sexual intercourse can cause trauma to the urethra because of its proximity; and the vaginal swelling that Amy described could be caused by trauma of the labia minora from a lack of lubrication during attempts penetrate. Further, Amy testified that Austin was the only person she had sexual contact with and that it was not possible for anyone else to have given her chlamydia.

¶37. Based upon this record, we find that a reasonable jury could find beyond a reasonable doubt that Austin's contact with Amy "included some slight penetration of the labia. That is all that is required to sustain the conviction for sexual battery." *Walker*, 262 So. 3d at 565 (¶12). The circumstances in *Walker*, for example, support this determination. This Court found in *Walker* that there was sufficient evidence of penetration based upon the victim's

17

alternative recollection of events that the defendant "had pulled her underwear down, made her get on top of him, and 'rubbed his private between her legs,' although it was 'outside' of her body." *Id.* The victim also said that the defendant had put his penis 'on top of her private.'" *Id.* Further, "the medical examination corroborated her account, noting redness of the labia majora." *Id. See also Burrows v. State*, 961 So. 2d 701, 706 (¶13) (Miss. 2007) (finding sufficient proof was presented to prove sexual battery where victim testified that Burrows "touched her butts with his 'daddy spot;'" the investigator also testified that the victim told him that Burrows "touched the inside of her bottom with his 'daddy spot,'" and there was evidence that both Burrows and the victim tested positive for chlamydia); *Moton*, 999 So. 2d at 1293-94 (¶21) (finding sufficient evidence of penetration where two-year-old child cried when urinating and vagina was red, swollen, and irritated).

¶38. **AFFIRMED.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR. LAWRENCE, J., NOT PARTICIPATING.**